# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BURKE, WARREN, MACKAY & SERRITELLA, P.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 10-CV-8267 |
| ELIZABETH TAMPOSI, | ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

On December 27, 2010, Plaintiff Burke, Warren, Mackay & Serritella, P.C. ("BWMS") filed this lawsuit seeking to collect unpaid attorneys' fees. Defendant Elizabeth Tamposi admits that there is jurisdiction over her in this district and that venue is proper. However, Tamposi asks the Court to transfer this case to Massachusetts where her legal malpractice claim against BWMS is pending. In return, BWMS asks the Court to enjoin Tamposi from proceeding with her legal malpractice claim in any court but this one. Both parties agree that Tamposi's legal malpractice claim is a compulsory counterclaim to BMWS's claim for unpaid fees (and vice versa). For the reasons set forth below, the Court grants Defendant Tamposi's motion to transfer [27] and denies Plaintiff BWMS's motion for an injunction [25]. The Court directs the Clerk of the Court to transfer this case to the District of Massachusetts so that the Massachusetts court may consider whether to consolidate this action with *Elizabeth M. Tamposi v. Stephanie Denby, Esq., et al.*, Case No. 10 CV 12283 (D. Mass).

## I. Background

Plaintiff Burke, Warren, MacKay, and Serritella ("BWMS") is a Chicago-based law firm located at 330 N. Wabash, 22nd Floor, Chicago, Illinois 60611. Stephanie Denby is a partner

with BWMS, whose principal area of practice is estates and trusts.  Since 1987, Denby has been personal and professional friends with Julie Shelton ("Shelton"), a Chicago-based commercial litigation attorney.  Shelton and her friend, Defendant Elizabeth Tamposi, a New Hampshire resident, came to Denby's office in Chicago to discuss various Tamposi trust related matters.  Based on these discussions, on May 30, 2007, Tamposi executed an engagement letter dated May 22, 2007, retaining BWMS to represent her "in conjunction with administration of [her] family trusts."

Tamposi was a beneficiary of family trusts (the "Trusts") established by her father, Samuel A Tamposi. The assets of the Trusts varied, but were mostly illiquid interests in family limited partnerships and family limited liability companies holding improved and unimproved real estate, as well as a small interest in N.E.S.V. 1, LLC, which owns the Boston Red Sox (referred to as the "Tamposi Partnerships").  Tamposi's father also gifted Tamposi Partnership interests to Tamposi outright.  Two of Tamposi's brothers, Sam Tamposi, Jr. ("Sam, Jr.") and Stephen Tamposi ("Stephen") acted as investment advisors to the Trusts and as managers of the underlying Tamposi Partnerships.  As investment advisors and managers, Sam, Jr. and Stephen committed to distributing a small percentage of cash to the Trusts while retaining the remainder of the cash flow in the Tamposi Partnerships.

The immediate reason that Tamposi retained BWMS stemmed from a settlement agreement relating to earlier family litigation.  Pursuant to the settlement agreement, Tamposi was permitted to appoint a trustee for the Trusts and the investment advisors agreed to resign as investment advisors with respect to certain liquid assets in the Trusts and Tamposi Partnerships (but they continued to act as managers for such Tamposi Partnerships).  The brothers retained control as managers over all of the Tamposi Partnerships, which included the power to sell the

underlying assets and determine the amount of distributions from the Tamposi Partnerships to the owners. However, under the settlement agreement, Tamposi now had the right to appoint the trustee who, under the Trust documents, had authority to distribute such amounts of the income and principal of the Trusts as the trustee "considers necessary for the education and maintenance in health and reasonable comfort" for the benefit of Tamposi and her descendants.

According to the declaration of Denby, when Tamposi first discussed the Trusts with Denby, Tamposi told Denby that her interim trustee had been diagnosed with a terminal condition and that she wanted advice regarding selection of a new trustee outside the New Hampshire area. Tamposi stated that Shelton had recommended Denby. Denby arranged for Tamposi to meet with four potential corporate trustees in Chicago (JP Morgan, Goldman Sachs, Northern Trust and US Trust/Bank of America). In advance of those meetings, Denby provided each trust company with copies of the trust documents, the settlement agreement, and financials for the Trusts, Tamposi and her family, and the various Tamposi Partnerships. Denby also discussed with the various potential corporate trustees the current financial needs of Tamposi and her children and the cash flows from the Tamposi Partnerships. After the meetings, each of the potential corporate trustees concluded that they could not accept the business. The potential corporate trustees raised concerns about the illiquidity of the Trusts' assets, the lack of cash flow from the Tamposi Partnerships into the Trusts, Tamposi's personal illiquidity, and Tamposi's and her children's immediate cash needs. In each case, the corporate trustee's fee would have equaled or exceeded the anticipated cash flow to the Trusts. After it became clear that a high end corporate trustee was not a feasible option, Tamposi asked for other alternatives for a trustee, and Denby suggested selecting a lawyer or accountant in New Hampshire. Ultimately, Tamposi offered the position to her long time friend and Chicago attorney, Shelton, who accepted. One of

the actions taken by Shelton as Trustee was to change the situs of the Samuel A. Tamposi, Sr. 1992 Trust from New Hampshire to Illinois.

BWMS's work for Tamposi expanded after the initial meeting in May of 2007. Denby attests that she and other members of BWMS worked on various matters for Tamposi, including the following:

> Working with the Investment Advisors to secure a $1 million distribution into the Trusts contemplated under the settlement agreement to reimburse Tamposi's legal fees in connection with the first litigation and to increase ongoing cash flow to the Trusts.
>
> Assisting Tamposi in ongoing work related to her pending divorce to protect the Trusts' assets from claims by Tamposi's husband.
>
> Identifying cash sources and methods to cut back on expenses for Tamposi, the Trusts, and her children to address Tamposi and her children's deteriorating financial situation (including sale of the house she was currently residing in, tapping into other family trusts Tamposi had established for her children, locating family funds held by her husband, sale of the house she was in the process of building on Lake Winnipesaukee, sale of the house she was currently occupying, request for distributions from various Tamposi Partnerships with cash on hand securing a construction loan, securing lines of credit, requesting funds from Tamposi's mother, establishing a loan from another brother, seeking student loans for her children and discussions with Tamposi about reentering the job market).
>
> Reviewing options to eliminate or reduce expenditures on the construction of the Lake Winnipesaukee house, including reviewing a residential construction contract Tamposi had entered into to build the house to determine the effect of a termination of the contractor on the project, counseling Tamposi on the benefits of selling the house and then working with the contractor to complete the project as quickly and inexpensively as possible.
>
> Assisting Tamposi's counsel in a case in New Hampshire against Sam, Jr. and his wife to secure temporary and permanent orders of protection from stalking based on a police investigation into threatening and harassing phone calls originating from Sam Jr.'s house to Tamposi's residence late at night which resulted in the issuance of temporary orders of protection against both Sam, Jr and his wife and, ultimately, a permanent order of protection being issued against Sam Jr.'s wife.
>
> Working with a lawyer for Tamposi's children to intervene in the divorce to attach any funds the husband received in the divorce from Tamposi and to prosecute a separate claim against Tamposi's spouse in connection with funds the

> husband had misappropriated and to freeze any funds that the husband received in the divorce pending resolution of the children's lawsuit.
>
> Assisting in the collection of various corporate accounts for family businesses owned in part by the children and Tamposi that the husband controlled.
>
> Assisting Boston attorney, Michael Weisman, who had been retained to negotiate with the brothers a sale of Tamposi's, her children's and the Trusts' interests in the various Tamposi Partnerships.

According to Denby, her work for Tamposi was undertaken almost entirely in the BWMS offices in Chicago. The record to date reflects that Tamposi met with Denby in Denby's offices in Chicago at least fourteen times from 2007 through 2009. BWMS has provided invoices that detail the work that BWMS performed for Tamposi. According to the invoices, the unpaid balance is $262,875.75.

As Tamposi's financial situation continued to deteriorate, and as the brothers refused to buy Tamposi's or the Trusts' interests in various Tamposi Partnerships (or to facilitate a sale), Tamposi brought two lawsuits against the Trusts' investment advisors. No BWMS attorneys participated as counsel of record for Tamposi in either lawsuit or otherwise filed an appearance on her behalf. However, Tamposi alleges that BWMS and Denby were the "masterminds" behind both of these lawsuits. Additionally, Tamposi claims that Denby and Shelton made mistakes in Chicago that led to Tamposi improvidently filing cases in Massachusetts and New Hampshire. Specifically, Tamposi alleges that Denby negligently failed to advise her of the risks of invocation of the *in terrorem* clause if Tamposi proceeded with the New Hampshire case. Additionally, Tamposi contends that the Massachusetts litigation influenced the judge's decisions in the New Hampshire case.

The first suit, filed September 28, 2007, was against the investment advisors for breach of fiduciary duty and to compel the sale of Tamposi's interest in the Boston Red Sox. The basic

premise was that the interest that Tamposi, her children, and the Trust owned in the Boston Red Sox was valued at well over $1 million and was one of the few liquid assets. The attorney chosen by Tamposi and Shelton to litigate the case involving the interest in the Red Sox (Denby was not involved in the selection) was Boston attorney, Michael Weisman. The Boston lawsuit was ultimately resolved by the sale of the Tamposi interest in the Boston Red Sox.

In October 2007, Tamposi and Shelton filed another case in New Hampshire Probate Court (the "New Hampshire case"). As in the Boston case, Weisman and his law firm were counsel for Tamposi in the New Hampshire Case, along with local counsel. No one from BWMS filed an appearance in the New Hampshire case. On August 18, 2010, Judge Gary R. Cassavechia entered an order in the New Hampshire case, finding in favor of the brothers and against Shelton and Tamposi. The order found that pursuant to an *in terrorem* clause in the Samuel A. Tamposi, Sr. 1992 Trust, Tamposi forfeited all her rights, title and interest in the Samuel A. Tamposi, Sr. 1992 Trust. Judge Cassavechia's order placed Tamposi and Shelton is a very unfavorable light and made findings that Tamposi was not honest and had acted in bad faith. Judge Cassavechia's order currently is on appeal by Tamposi before the New Hampshire Supreme Court.

BWMS filed the present lawsuit seeking payment of the fees and expenses on December 29, 2010. Two days later, Tamposi filed suit in the United States District Court for the District of Massachusetts in Boston entitled *Elizabeth M. Tamposi v. Stephanie Denby, Esq., Burke Warren MacKay and Serritella, P.C., Michael Weisman, Esq., Rebecca McIntyre, Esq., Weisman & McIntyre, P.C., Julie Shelton, individually and in her capacities as the Trustee of the Elizabeth M. Tamposi GST Exempt Trust and the Elizabeth M. Tamposi Trust, both created under the Samuel M. Tamposi, Sr. 1992 Trust, and in her capacity as Trustee of the Elizabeth M. Tamposi*

6

*Trust, both created under the Samuel M. Tamposi, Sr. 1994 Irrevocable Trust, Butler Rubin Salterelli & Boyd, LLP, and Baker & Daniels, LLP*, Case No. 10 CV 12283.  The basis of the malpractice complaint is that Tamposi's attorneys (including Denby and BWMS) failed to advise her that if she proceeded with the New Hampshire case, she was at risk for invocation of the *in terrorem* clause.  Tamposi also alleges that it was Denby's idea to file both the Massachusetts and New Hampshire cases.

Prior to the filing of either this suit or the malpractice case, the parties attempted mediation, but their efforts were unsuccessful.  BWMS admits that it knew that Tamposi planned to file a malpractice suit in Massachusetts, and, "preferring to litigate this case in its home jurisdiction and not wanting to be forced to litigate in Massachusetts," filed this lawsuit for fees.

On March 17, 2011, the parties to this case and the malpractice case signed an agreement staying this case through June 17, 2011 and the malpractice case through June 19, 2011.  Paragraph 4 of the Stay Agreement provides that "[d]uring the stay period, no party shall file any claim, counterclaim, cross-claim, or other request for relief against any other party arising out of the same facts or circumstances as either the Illinois or the Massachusetts Action in any other forum or proceeding."  On March 17, 2011, this Court entered an order staying all proceedings in this case until June 17, 2011.  On May 26, 2011, the Massachusetts district court entered an order extending the stay in the malpractice case until July 18, 2011.

## II. Analysis

### A. Venue

Defendant contends that this case should be transferred to the United States District Court for the District of Massachusetts in Boston.  The transfer statute, 28 U.S.C. § 1404(a), provides that: "For the convenience of parties and witnesses, in the interest of justice, a district court may

7

transfer any civil action to any other district or division where it might have been brought." See also *Baird v. Blue Cross Blue Shield of Texas*, 2011 WL 4345845, at *5 (N.D. Ill. Sept. 14, 2011). There are several factors courts consider in deciding whether to transfer a case to another federal district court. As a threshold matter, the court considering transfer must determine whether venue is proper in the district where the action was originally filed and whether venue would be proper in the transferee court. Where jurisdiction is founded solely on diversity of citizenship, venue is proper in: "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(a). The district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought," any case filed in the wrong venue. 28 U.S.C. § 1406(a).

In evaluating motions brought pursuant to Section 1404(a), if venue is proper in more than one district, the Court considers: (1) the plaintiff's choice of forum, (2) the convenience of the parties, (3) the convenience of witnesses, (4) the interests of justice, and (5) the location of the material events giving rise to the case. *Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 254 (7th Cir. 1996) (listing the first four statutory factors); *Continental Cas. Co. v. Staffing Concepts, Inc.*, 2009 WL 3055374, *2-3 (N.D. Ill. Sept. 18, 2009) (same; elaborating on private- and public-interest sub-factors).[1] Although the statute itself lists only the first four

---

[1] Beyond the statutory factors, there appears in the case law variations among courts as to the specific factors that should be analyzed, as well as the classification of those factors. Compare, *e.g.*, *Am. Family Ins. ex rel. Suddarth v. Wal-Mart Stores, Inc.*, 2003 WL 1895390, *1 (N.D. Ill. Apr. 17, 2003), with

factors, considering additional factors, such as location of the material events, is appropriate: the Seventh Circuit teaches that the specified statutory "factors are best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case." *Coffey*, 796 F.2d at 219 n.3; see also *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir. 1986) (explaining that the broad discretion accorded the trial court is a product of the "in the interest of justice" language of the statute); *Am. Commercial Lines, LLC v. Northeast Maritime Institute, Inc.*, 588 F. Supp. 2d 935, 945 (S.D. Ind. 2008) (observing that courts "entertain a wide variety of factors" in evaluating venue transfer motions).

Venue statutes serve the purpose of "protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1576 (Fed. Cir. 1990). Plaintiff bears the burden of establishing that venue is proper. *Grantham v. Challenge-Cook Bros., Inc.*, 420 F.2d 1182, 1184 (7th Cir. 1969). The burden is met by making a *prima facie* showing that venue is proper. See *Sanderson v. Spectrum Labs, Inc.,* 2000 WL 1909678, at *3 (7th Cir. Dec. 29, 2000); *Bell v. Woodward Governor Co.,* 2004 WL 1498145, at *1 (N.D. Ill. July 2, 2004).

Defendant first maintains that venue is proper in Massachusetts under § 1391(b)(2).[2] Section 1391(b)(2) provides that venue is proper in a district where a substantial part of the events or omissions giving rise to the claim occurred. The test is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a *substantial* portion of the activities *giving rise to the claim* occurred in the particular district. See *Pfeiffer v.*

---

*Graham v. United Parcel Svc.*, 519 F. Supp. 2d 801, 808-09 (N.D. Ill. 2007). More precisely, courts vary in their formulations but generally, in the end, consider the same factors.

[2] Since Defendant does not reside in Illinois or Massachusetts, § 1391(a)(1) does not provide for venue in Illinois or Massachusetts.

*Insty Prints*, 1993 WL 443403, at *2 (N.D. Ill. Oct. 29, 1993). Generally, courts in this circuit, as well as sister circuits, focus on the activities of the defendant, not the plaintiff, in making venue decisions under § 1391(b)(2). See *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) (stating that courts should "focus on relevant activities of the defendant, not of the plaintiff," in making venue decisions); *Moran Industries, Inc. v. Higdon*, 2008 WL 4874114, at *5 (N.D. Ill. June 26, 2008) (citing *Woodke*) (same); *PKWare, Inc. v. Meade*, 79 F. Supp. 2d 1007, 1016 (E.D. Wis. 2000) ("In determining where substantial parts of the underlying events occurred I focus on the activities of the defendant and not those of the plaintiff."). While that concern is not explicitly stated in (b)(2), it comports with the general theory that "[v]enue under 28 U.S.C. § 1391 usually respects defendants' interests." *Board of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1036 (7th Cir. 2000). The test for venue under § 1391 looks not to the defendant's contacts with the forum, but rather to the location of the events giving rise to the cause of action. See *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d. Cir. 1994). Even focusing on the relevant activities of the defendant, fairness still is insured by the requirement that the events in the district be "substantial." Indeed, district courts have been warned not to overlook the requirement that the activities be substantial:

> [W]e caution district courts to take seriously the adjective "substantial." We are required to construe the venue statute strictly. See *Olberding v. Illinois Cent. R.R.,* 346 U.S. 338, 340, 74 S.Ct. 83, 98 L.Ed. 39 (1953). That means for venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. It would be error, for instance, to treat the venue statute's "substantial part" test as mirroring the minimum contacts test employed in personal jurisdiction inquiries. See *Jenkins Brick,* 321 F.3d at 1372; *Cottman Transmission Sys. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994); *cf. United States ex rel. Rudick v. Laird,* 412 F.2d 16, 20 (2d Cir.1969) ("The concepts of personal jurisdiction and venue are closely related but nonetheless distinct.").

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) (emphasis in original).

Tamposi concedes that venue is proper in Illinois with respect to BWMS, but contends that venue also is proper in Massachusetts because a lawsuit was filed in Massachusetts with respect to the Red Sox ownership and BWSM was involved in the strategy behind that lawsuit. According to Tamposi, and not refuted by BWSM, Denby was the architect of the Massachusetts litigation, developing theories, drafting and revising pleadings, recommending a motion for temporary restraining order, and having conferences with Massachusetts counsel in which it provided information and advice to him in Massachusetts, along with other litigation support services. These assertions are supported by BWMS's billing records and emails.

Clearly, the Red Sox lawsuit is a part of Tamposi's legal malpractice claim; however, how substantial a part is debatable. Only three paragraphs of Tamposi's 83-paragraph complaint reference the Suffolk litigation (see Malpractice Complaint ¶¶ 25, 32, 33) and do so more as a backdrop to the issues raised by the New Hampshire litigation. In the New Hampshire case, Tamposi maintained that her brothers had breached their fiduciary duties and sought their removal as the investment advisers and the decoupling of the assets of her trusts from the assets of her sibling's trusts. By contrast, the subject of the Massachusetts case was to compel the sale of Tamposi's interest in the Red Sox, a result that was achieved, although not easily, in the Suffolk action. The majority (if not all) of the damages that Tamposi seeks arise from the New Hampshire litigation, and, in particular, Judge Cassavechia's August 18, 2010 order. Counts I through IV of the Massachusetts complaint allege that Tamposi's damages are "forfeiture of her future income stream from the EST Trust, payment of millions in legal fees to the investment directors, and reimbursement of millions of dollars to the EMT Trust." Massachusetts Malpractice Complaint ¶ 46, ¶ 51, ¶ 55, ¶ 59. These alleged damages arise out of the New Hampshire lawsuit, as the malpractice allegations are that BWMS and Denby failed to properly

advise Tamposi of the risk that the *in terrorem* clause would be invoked if Tamposi sought removal of the brothers as investment advisers and the separation of the assets of her trusts from the trusts of her siblings. The malpractice complaint then alleges that Tamposi suffered the forfeiture of all her rights, title, and interest to the trusts including all benefits "received by her retroactive to the date of filing the original New Hampshire Complaint." Massachusetts Malpractice Complaint ¶ 41.

Although the malpractice complaint makes clear that the damages arise from the result in the New Hampshire case, Tamposi's allegations are that the two lawsuits, filed within two weeks of each other, are inextricably intertwined and together led to the New Hampshire judge's decision. Indeed, in ordering the forfeiture of Tamposi's interests in the family trusts as the sanction for her violation of the *in terrorem* clause that guarded against any attack on the trust and business structure set up by Sam Tamposi, Sr., the New Hampshire judge made findings regarding the Red Sox litigation. First, he noted his belief that Tamposi's attorneys tried to "sabotage" the sale: "Incredibly, and for reasons serving no purpose other than to render more difficult if not sabotage the investment directors' efforts to negotiate a sale of the Red Sox shares on February 1, 2008, on behalf of [Shelton and Tamposi], their attorney wrote the attorney for the Red Sox of Betty's objection to certain actions she expected Sam Jr. to take or that he had taken on behalf of Tamposi LLC." He then noted that it did not "appear that the Red Sox placed any credence on Weisman's assertions," but that the Red Sox were "bothered by the expense incurred for representation in the Massachusetts litigation initiated by [Tamposi and Shelton]." Finally, he concluded that Tamposi's actions in the Red Sox lawsuit "constituted precisely the type of decentralized and fragmented approach to management that Sam, Sr. sought to avoid under the Third Amendment. It lends great compliment to Sam, Jr. and Steve's skills and the

confidence entrusted in them by their father that they were yet able to negotiate a sale for the price they did." See, *e.g.*, New Hampshire Probate Court Order at 17-21. The import of these, and other findings in the New Hampshire Court's order, is that the judge believed that there was a concerted effort, beyond the filing of the New Hampshire litigation, by Tamposi and her counsel to attack the structure of the family trusts in an effort to defeat Sam, Sr.'s estate plan.

Although the Suffolk litigation may not directly give rise to her alleged damages (whereas the New Hampshire litigation does), BWMS's involvement in the litigation strategy with respect to both lawsuits serves as a substantial part of Tamposi's malpractice allegations. See, *e.g.*, *Chemical Waste Management, Inc. v. Sims*, 870 F. Supp. 870, 875 (N.D. Ill. 1994) (stating that the test is "not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in the particular district."). Because the allegations are that BWMS actively participated in the litigation strategy for both lawsuits (and indeed the billing records and Denby's own statements reflect her active participation in both), BWMS's contacts with and activities in or related to Massachusetts would not be considered incidental to Tamposi's malpractice claim. The allegations are that in communicating with lead litigation counsel in Massachusetts, BWMS was not merely reporting ongoing activities in Illinois, but rather was actively participating in the management of the litigation in Massachusetts and New Hampshire. Compare *Pfeiffer*, 1993 WL 443403, at *3 (finding that facts alleged in complaint and documents submitted by plaintiff only supported that the phone calls and correspondence relied upon informed plaintiff about ongoing contractual activities in Milwaukee, and did not constitute the performance of those contractual obligations), with *Master Tech Products, Inc. v. Smith*, 181 F. Supp. 2d 910, 914 (N.D. Ill. 2002) (finding that making telephone calls and sending agreements

13

were more than "part of the historical predicate" for the RICO claim; rather, they were the "essence of the claim and form[ed] a substantial part of the events giving rise to it"). The communications between BWMS and Massachusetts pertain directly to the conduct underlying Tamposi's malpractice claim, and, because of its compulsory nature, this lawsuit.

Furthermore, should this case and the malpractice case proceeds on the merits, the discovery will include the lawyer's representation of Tambosi, including the work performed, the advice given, the fees charged, and whether or not Tamposi's damages alleged are attributable, at least in part, to her attorneys. Although BWMS was performing the majority of its work in Illinois, the work performed affected people and trusts and furthered litigation efforts elsewhere. Furthermore, according to Tamposi and not refuted by BWMS, Tamposi's former counsel in Massachusetts has the majority of the litigation documents. The Tamposi family trusts are found in New Hampshire and the investments were managed out of New Hampshire. The key witnesses will be the lawyers (residing in Illinois and Massachusetts), Shelton (Illinois),[3] Tamposi (New Hampshire), and possibly Tamposi's family (also New Hampshire). Based on the location of witnesses and documents, Massachusetts, in which one of the underlying suits was filed and with its close proximity to New Hampshire, is a more convenient venue than Illinois.

Finally, in the interests of justice, the Court believes the best course is to avoid a situation where the parties must litigate overlapping (if not identical) claims in two different districts. The principal theory in the legal malpractice action is that Defendants designed, filed, and pursued litigation that was insufficiently attentive to the *in terrorem* clause that governed the Tamposi family trusts, while advising Tamposi that their recommended course of action was safe. Tamposi paints Denby as the trust expert and Weisman as the litigator, and alleges that they were

---

[3] Notably, Shelton is not contesting Massachusetts as the appropriate forum.

jointly responsible for the failure to advise on the scope and meaning of the *in terrorem* clause in the context of their recommended litigation plan over the administration of the trusts. In terms of theory, liability, causation and damages, there does not appear to be a marked difference between the malpractice cases against Weisman and BWMS. What advice they gave (or failed to give) will control the malpractice outcome on liability. If Tamposi were required to bring her malpractice action here, she may be unable to get jurisdiction over Weisman, who is a Massachusetts resident licensed to practice law in Massachusetts and who did not contract in Illinois to represent anybody. Requiring two federal district courts to analyze predominately the same issues, involving the same parties, is not an efficient use of judicial resources.

A final note worth mentioning is that a case certainly could be made to transfer this lawsuit (as well as the Massachusetts suit) to New Hampshire—where Tamposi resides, where the trusts are located, where the litigation that gave rise to the majority of the damages took place, and which presumably would have jurisdiction over all Defendants. However, both parties decided against bringing their claims in New Hampshire as a matter of litigation strategy. Thus, this Court, weighing judicial efficiency and economy, and giving less weight to the parties' wishes (which clearly have not taken into account judicial economy but rather their own self-interests), concludes that venue is appropriate in Massachusetts, and, as between Illinois and Massachusetts, determines that Massachusetts provides the superior forum for potentially litigating all the claims, as opposed to the piecemeal approach offered by Plaintiff. See, *e.g.*, *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986) (noting the propriety of considering "the efficient administration of the court system" in an "interest of justice" analysis and stressing that "related litigation should be transferred to a forum where consolidation is feasible").

### B. Motion for Preliminary Injunction

Because the Court has determined that venue lies in Massachusetts and Massachusetts is the superior forum for litigating this fee dispute (which the parties have agreed is compulsory to Plaintiff's malpractice suit), the Court denies Plaintiff BWMS's motion for a preliminary injunction.

### III. Conclusion

For the reasons set forth below, the Court grants Defendant Tamposi's motion to transfer [27] and denies Plaintiff BWMS's motion for an injunction [25]. The Court directs the Clerk of the Court to transfer this case to the District of Massachusetts.

Dated: November 4, 2011

_____
Robert M. Dow, Jr.
United States District Judge